IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

VERNON EVANS, JR.                   :
      Plaintiff,                 :
                                       :
  v.                                :   Civil No. L-06-149
                                       :
MARY ANN SAAR, et al.               :
      Defendants.               :

## MEMORANDUM

### I.   Introduction

Now pending are Vernon Evans Jr.'s motion for a temporary restraining order and motion for a preliminary injunction. For the reasons stated herein, the Court will DENY both motions.

### II.   Maryland's Lethal Injection Protocol

On January 9, 2006, a Maryland judge signed a warrant for the execution of Vernon Evans, Jr. The warrant directs the State to carry out the execution during a five-day span beginning February 6th and ending February 10, 2006.

On January 19th, Evans filed the instant suit under 42 U.S.C. § 1983, claiming that Maryland's Lethal Injection Protocol exposes him to a grave and unnecessary risk of cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution.[1] The following day, Evans moved for a temporary restraining order and a preliminary injunction to halt his execution until the merits of his suit can be tested through discovery and trial.

---

[1] The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Evans, who was convicted of two first degree murders in 1984, does not challenge in this suit Maryland's right to execute him. Nor does he challenge the constitutionality *per se* of lethal injection as a method of execution. Instead, his suit attacks the Lethal Injection Protocol ("the protocol") under which Maryland's Department of Public Safety and Correctional Services carries out executions.

Under the protocol, three successive chemicals are injected intravenously through an I.V. hook-up. First, a massive dose (3 grams) of sodium pentothal, an ultrashort-acting barbiturate (also called thiopental), is injected to induce unconsciousness. The parties agree that this dosage, if successfully administered, is enough to drive any human being into deep unconsciousness for hours. The barbiturate is followed by an injection of 50 milligrams of pancuronium bromide (or Pavulon), an agent that paralyzes all voluntary muscles. Although the agent causes paralysis, and in high dosages stops respiration, it has no effect whatsoever on a person's awareness or sensation. Finally, the inmate is injected with a huge dose (50 millequivalents) of potassium chloride, which causes cardiac arrest and death. Apart from its lethality, potassium chloride is an extraordinarily painful chemical that scours the nerve fibers lining a person's veins.

Evans concedes that this protocol, if successfully implemented, will result in a swift, painless, and humane death. He argues, however, that flaws in the protocol create a high risk that the sodium pentothal will not render him completely unconscious. If so, he would suffer excruciating pain from the powerful effects of the other two drugs but be unable to alert anyone to his plight because of the paralyzing effect of the pancuronium bromide.

The State concedes that if an inmate is not adequately anesthetized he will suffer an inhumane death. Defendants emphatically assert, however, that sodium pentothal, when administered by trained personnel in the prodigious quantity specified by the protocol, will unfailingly render anyone, Evans included, unconscious.

**III.     Evans's Challenges to the Protocol**

In support of his claim, Evans raises a number of perceived problems with Maryland's protocol as applied to him. Most importantly, Evans disagrees with the State's plan to access his peripheral veins. He argues that the damage done to these veins by years of chronic intravenous drug abuse have left them frail, clotted, and unsuitable as conduits.

Evans urges other deficiencies, including the following:

   i.)   The standard of care requires the presence of a trained anesthesiologist, sitting elbow to elbow with the inmate throughout the procedure.

   ii.)  The protocol fails to require a doctor or other demonstrably qualified person to mix the sodium pentothal.

   iii.) The I.V. lines are too long, creating the prospect of a leak.[2]

   iv.)  Pancuronium bromide serves no useful purpose and should not be used in the protocol. In support of this proposition, Evans points out that the American Veterinary Medical Association prohibits the use of

---

[2]     During the lethal injection, the inmate is in the Execution Room, while the person who administers the injection is in an adjoining room, the Lethal Injection Room. The I.V. line must be long enough to extend through a portal connecting the two rooms. The components of the I.V. line are connected by Luer Locks.

neuromuscular paralytic agents, such as pancuronium bromide, in animal euthanasia.

v.) A recently executed Maryland inmate, Steven Oken, may not have had enough sodium pentothal in his blood (per the post-mortem blood toxicology report) to keep him unconscious.

vi.) The protocol fails to account for all of the variables that might complicate the preparation and administration of the drugs.

## IV. Progress of the Lawsuit

As stated, Evans filed suit only two weeks before the start of his five-day execution window. Although last-minute death penalty filings impose extraordinary time pressures, a Court cannot issue a stay merely to give itself more time. An inmate is entitled to a stay only if he can satisfy the rigorous requirements for obtaining a temporary restraining order. Moreover, unless the inmate can point to a compelling reason for filing his suit at the eleventh hour, his delay counts against him in the Blackwelder calculus.[3]

Despite the shortness of time, the Court is satisfied that its decision is based on an adequate record. The factors that buttress this conclusion include the following:

i.) Attorneys for both sides have been involved in prior method-of-execution cases. They were able to file comprehensive briefs in a matter of days.

ii.) There is a substantial body of cases involving eleventh hour, Eighth Amendment challenges to the three-drug protocol.

---

[3] Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977), provides the standard with which the Fourth Circuit judges applications for preliminary injunctive relief.

iii.) Thirty-eight states impose the death penalty. Of these, thirty-seven use lethal injection as the means of execution. Thirty-five of those states use the same three-drug protocol as Maryland. Circuit after Circuit (including the Fourth) has ruled that the protocol does not run afoul of the Eighth Amendment.

iv.) Since 2004, Maryland has executed two inmates (Steven Oken and Wesley Baker)[4] by lethal injection. Both inmates filed a § 1983 suit challenging the constitutionality of the protocol. In each case, the inmate's motion for a temporary restraining order was ultimately denied and the executions were carried out.

v.) In the litigation that preceded Oken's execution, the Maryland Court of Appeals ruled, albeit in a *per curiam* opinion, that the three-drug protocol violated neither the Maryland death penalty statute nor the Maryland Constitution. The Court, which is Maryland's highest, specifically decided that "the method of execution intended to be implemented by the Division of Correction does not violate the provisions of the Maryland Code . . . or constitute a cruel or unusual punishment as argued by petitioner."[5]

vi.) This Court ordered expedited discovery and reviewed *in camera* the voluminous execution notebooks that the State compiled for Maryland's last

---

[4]   Steven Oken was executed in June, 2004, and Wesley Baker was executed in December, 2005.

[5]   Oken v. State, 381 Md. 580, 580-81 (2004) (internal citation omitted).

                three executions.[6]  The Court culled the pages pertinent to the protocol and produced them (slightly redacted) to Evans's counsel.

vii.)    The Court signed an order requiring the Office of the Chief Medical Examiner to produce post-mortem reports prepared following the Gilliam, Oken, and Baker executions.

viii.)    The Court conducted hearings on three different days.  The hearings included live testimony from Evans's medical expert, Dr. Mark Heath, a board certified anesthesiologist who is a national authority on the three-drug protocol.  Evans also called a trauma specialist, Dr. Thomas Scalea, who examined Evans's veins.[7]  The State submitted a lengthy affidavit from Dr. Mark Dershwitz, a board certified anesthesiologist, who is also a national authority on the three-drug protocol.[8]

        The factual record is, therefore, adequate.  The legal standards are also well developed.  Section 1983 does not empower this Court to "micromanage" Maryland's execution procedures.  What might be done to improve the three-drug protocol is not the appropriate inquiry.[9]  A federal court must pay deference to the judgment of the state

---

[6]    Terrence Gilliam (executed November, 1998), Steven Oken, and Wesley Baker.

[7]    Dr. Scalea is Physician-in-Chief at the R. Adams Cowley Shock Trauma Center at the University of Maryland School of Medicine, Baltimore.

[8]    Evans also submitted the affidavit of Dennis R. Geiser, D.V.M., Chief of Service in large animal anesthesiology at the College of Veterinary Medicine, University of Tennessee.

[9]    See Abdur'rhaman v. Bredesen, No. M2003-01767-SC-R11-CV, 2005 WL 2615801, at *6 (Tenn., Oct. 17, 2005).

government, which, in the words of the Supreme Court, is presumed to have acted in "a careful and humane manner."[10]

## V.     Test for Injunctive Relief

Evans bears an added burden because he seeks emergency injunctive relief. In the context of a stay of execution, "last minute stays on the part of federal courts represent an interference with the orderly process of justice which should be avoided in all but the most extraordinary circumstances."[11] Furthermore, "the court may consider the last minute nature of an application to stay execution in deciding whether to grant equitable relief."[12]

Preliminary injunctions are extraordinary remedies to be granted when the moving party has demonstrated a need to preserve the status quo and prevent irreparable harm during the pendency of litigation.[13] To earn a stay, Evans must satisfy the test articulated in Blackwelder and succeeding cases. Under Blackwelder, a court considers (i) the harm to the plaintiff if the injunction is denied; (ii) the harm to the defendant if the injunction is granted; (iii) the plaintiff's likelihood of success on the merits, and (iv) the public interest.[14] The Fourth Circuit does not, however, weigh these factors equally.[15]

---

[10]   Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 462, 464 (1947).

[11]   Stockton v. Angelone, 70 F.3d 12, 13 (4th Cir. 1995).

[12]   Cooper v. Rimmer, 379 F.3d 1029, 1031 (9th Cir. 2004) (citing Gomez v. United States District Court for the Northern District of California, 503 U.S. 653, 653-654 (1992)).

[13]   See In re Microsoft Corp. Antitrust Litigation, 333 F.3d 517, 525-26 (4th Cir. 2003).

[14]   550 F.2d at 194-96.

7

"The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors."[16]

In the context of method-of-execution cases, both sides agree that the Ninth Circuit Court of Appeals has appropriately distilled the Blackwelder test into a single inquiry. A court must inquire whether an inmate facing execution has shown "that he is subject to an unnecessary risk of unconstitutional pain or suffering such that his execution by lethal injection [using the three-drug protocol] must be restrained."[17] Inherent in this formulation is the requirement that the risk must be substantial.

**VI.    Applying the Test for Injunctive Relief**

When applying this standard, Evans's claims must be separated into two categories: first, his challenge to the protocol in general; second, the application of the protocol to him.

A.   Evans's Challenge to the Protocol in General

With regard to the first question, his challenge fails. Evans has not shown that there are substantial and unnecessary risks intrinsic to the procedure. His overarching concern is that he will not be anesthetized properly. His medical expert, Dr. Heath, explained that during a surgical procedure, the patient must be maintained in a narrow surgical plane of anesthesia. If the plane is too shallow, the patient will regain consciousness. If too deep, the patient may die. A fully trained and licensed anesthesiologist is needed to maintain the delicate balance.

---

[15]    See Oken v. Sizer, 321 F. Supp. 2d 658, 666 (D. Md. 2004).

[16]    Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 2001).

[17]    Cooper, 379 F.3d at 1033.

8

An execution requires no such balance. The only concern is that the plane must not be too shallow. As Dr. Heath acknowledged, three grams of sodium pentothal, which is multiples of the surgical dose, will drive any individual into deep unconsciousness. Evans has failed to demonstrate that an anesthesiologist is required to administer this massive dose.[18]

Evans also expresses concern that the members of the Execution Team may not be adequately trained. He would require the State to name the members of the Team and demonstrate their qualifications. Evans is not entitled to this information, however. Because of the controversy surrounding executions, the State reasonably withholds the names of the Execution Team members except for the Warden, who serves as Execution Commander.

The qualifications of the team also appear adequate. On the day of the execution, a certified nursing assistant examines the inmate, establishes the I.V., and determines that saline solution is flowing properly through the line. To preserve her anonymity, the nurse is not physically next to the inmate when the injection itself is being administered. She is, however, in an adjoining room, monitoring the procedure through a window.

During the injection, the Warden and a Religious Advisor stand near the inmate. Although they are not medically trained, these observers can determine whether there are any major problems such as a leak in the I.V. line. A doctor is present throughout the execution.

---

[18] Furthermore, the protocol has a built-in "back-up" procedure: extra syringes of all the drugs are prepared, and intravenous lines are placed in both the inmate's arms in case one line does not work.

9

In the weeks leading up to the execution, the team performs frequent drills, rehearsing the entire procedure. Two of the three chemicals come pre-prepared from the manufacturer. The third, sodium pentothal, requires mixing a powder with a diluent, but the procedure is straightforward.

Moreover, there is no probative evidence that the team failed to carry out the protocol successfully in past executions. The best evidence on this point comes from the blood toxicology reports, which show the post-mortem levels of sodium pentothal for Gilliam (24mg/liter), Oken (10mg/liter), and Baker (44mg/liter). Based on the dose-response graph for sodium pentothal, Dr. Heath testified that both Gilliam and Baker should have been deeply unconscious during their executions. He assigned a 5% probability, however, that Oken was not fully anesthetized.

After reviewing this evidence, the Court concludes that Evans "has done no more than raise the possibility that [Maryland's] lethal injection protocol risks an unconstitutional level of pain and suffering."[19]  His showing as to the protocol in general, therefore, is insufficient to warrant injunctive relief staying the execution.

    B.    <u>Evans's Challenge to the Protocol as Applied to Him (Compromised Veins)</u>

Evans also raises concerns about the execution protocol as applied to him. Evans was an intravenous drug abuser for many years. The well-qualified doctor, Thomas Scalea, who examined Evans on January 24th, testified that Evans has ravaged most of his peripheral veins. Dr. Scalea stated that "neither of Mr. Evans's arms nor his lower extremity . . . would be suitable for performing a lethal injection." While Evans may have usable veins in his left hand, Dr. Scalea expressed concern that "given his drug use,

---

[19]    See <u>Cooper</u>, 379 F.3d at 1031.

10

the use of fluid and/or medication delivered by this route may not be transported quickly through his veinous [sic] system."

During a hearing, Dr. Scalea testified that it might be possible to access one of Evans's peripheral veins.  He strongly recommended, however, the use of a "central line," meaning that the I.V. would tap one of the body's three central veins.  Two of these (the internal jugular and the subclavian) are in the neck and chest, and the third (the femoral) is in the groin.  Dr. Scalea stated that a central line is "as reliable a line as we have."  Dr. Heath agreed, testifying that the installation of a central line would virtually guarantee an adequate delivery of the three drugs into Evans's blood stream.

On January 10th, the certified nursing assistant on the Execution Team examined Evans.  She reported that the veins in his arms are adequate.  After hearing Dr. Scalea's report, however, the State agreed to have Evans re-examined.  Meanwhile, at the Court's request, Evans's counsel asked him whether he would prefer a central line.  Evans stated that he would.   Before Evans was re-examined, the State said that it would use a central line if medically necessary.  To avoid complexity, however, the State also expressed a strong preference to access a peripheral vein.

The final hearing was held on February 1st.  The State had arranged for three medical para-professionals to examine Evans the day before.  Although not medical doctors, all three, a certified nursing assistant and two paramedics, have extensive experience inserting and monitoring I.V.s.  The nursing assistant is especially well qualified.  She works at a large, metropolitan hospital in critical care phlebotomy and I.V. insertion.  Her affidavit states that, "I also serve as a hospital-wide resource for IV insertion on difficult patients."

11

The three para-professionals jointly examined Evans by touch and by sight.  They jointly concluded that many of his peripheral veins are "visible to the naked eye, all were palpable, soft, and pliable, and all seemed healthy enough…to support an IV catheter and fluid administration."

The major concern is that Evans's vein might rupture under pressure, causing the drugs to infiltrate the surrounding tissue instead of his vein.  The protocol minimizes this risk, however.  The completed Lethal Injection Checklist for the recent execution of Wesley Baker (the same checklist will be used for Evans) is instructive.  I.V.s were inserted into Baker's left arm and then his right arm (one was a back-up), and the flow of saline solution was verified.  The flow was then monitored for ten minutes.  The saline solution was not under high pressure.  Nevertheless, the suitability of Baker's veins to receive fluids over time was confirmed.

According to the Baker checklist, the medical attendants then passed the I.V. bags through a portal connecting the execution area (where the inmate lies on a table) with the adjoining lethal injection room.  The bags were placed on stands. The attendants then confirmed the operability of the I.V., left Baker's side, and went into the lethal injection room.

A member of the Execution Team then injected consecutively two syringes of sodium pentothal into the I.V. line under high pressure.  He then allowed the I.V. to run wide open with saline solution for ten seconds to flush the line.

Only afterward were the lethal drugs (pancuronium bromide and potassium chloride, respectively) injected into the I.V. line, also under high pressure.  Only one minute elapsed from the pancuromium bromide injection to a "flat line" EKG reading.

Applying the protocol to Evans's case, the first of the lethal chemicals will not be injected until after Evans's I.V. line has been subjected to at least ten minutes of low-pressure I.V. flow, two high pressure injections, and a ten-second wide open saline flow. His vein must remain continent only for another few minutes for the execution to be complete. Under the protocol, the medical personnel are responsible for reporting problems to the Execution Commander. At the final hearing, one of the paramedics who examined Evans, and who is also a back-up member of the Execution Team, testified concerning this responsibility. He expressed confidence that the medical personnel would be able to spot any problems with Evans's I.V. He also expressed confidence that the Execution Commander would, if necessary, halt the execution.

It might be preferable for medical personnel to be present at Evans's side throughout the execution, especially during the last few minutes so that they could closely inspect the insertion area. Because Evans's death will be witnessed, however, the State has a legitimate interest in preserving the confidentiality of the participating medical personnel. The protocol accomplishes this by having them monitor Evans from behind a window. This logistical compromise does not implicate the Eighth Amendment. This Court respects the opinions of Drs. Heath and Scalea. It would be an exercise in speculation, however, to find that Evans faces a substantial and unnecessary risk of unconstitutional pain and suffering.

Using a central line would eliminate any concern over the suitability of Evans's peripheral veins, but it is not this Court's prerogative to dictate a set of best practices for each execution. The State has broad discretion in this matter. This Court will not restrict

the State's discretion because Evans has failed to demonstrate that the protocol, as applied to him, is likely to fail.

**VII.   Procedural Issues**

Because of the shortness of time, this opinion has been necessarily brief.  The case presented a host of procedural issues that merit mentioning, as follows.

    A.  Waiver

The State argues that because Evans did not challenge execution by lethal injection when the state enacted its lethal injection statutes in 1994, he has waived all right to challenge the protocol.  The Court rejects this argument because Evans did not receive the protocol itself in 1994.  Waivers must be knowing and voluntary.

    B.  Pleading with Particularity

The State argues that Evans's claim is barred because he did not "allege or show that there is any alternative to the protocol that the State proposes to use in his execution."[20]  This argument fails because the Fourth Circuit Court of Appeals has not adopted this heightened pleading requirement.[21]  Moreover, Evans's detailed objections to the protocol adequately specify his concerns.

    C.  Administrative Exhaustion

The State argues that Evans's claim is barred because he did not exhaust his administrative remedies, as required by the Prison Litigation Reform Act of 1995 (PLRA).[22]  On December 9, 2005, Evans filed a Request for Administrative Remedy with

---

[20]   Aldrich v. Johnson, 388 F.3d 159, 161 (5th Cir. 2004).

[21]   See Reid v. Johnson, 105 Fed. Appx. 500, 503 (4th Cir. 2004).

[22]   See 42 U.S.C. § 1997e(a).

the Department of Correction.[23]  The Warden denied his request, and Evans is still waiting for the Commissioner to rule on his appeal.  Even after the Commissioner rules, there are additional steps in the administrative review process that remain open.

Exhaustion of administrative remedies is not a jurisdictional requirement under the PLRA.[24]  Rather, exhaustion is an affirmative defense to be pled by the State.[25]  Given the shortness of time, this Court is unprepared to decide whether Evans's failure to exhaust is attributable to his delay in filing his administrative claim or the State's delay in deciding it.  Given this uncertainty, the Court concludes that the State has not met its burden.  Evans's claim is, therefore, not procedurally barred.

　　　D.  Evans's Delay in Bringing this Lawsuit

The State criticizes the eleventh-hour filing of Evans's complaint, contending it was brought for the purpose of manipulating the legal process.  Indeed, Evans has known

---

[23]　　Department of Correction Directive (DCD) 185-100 provides that an inmate initiates the Administrative Remedy Procedure by filing a Request for Administrative Remedy.  Each complaint is processed and investigated.  If the Warden denies the complaint, the inmate can appeal the Warden's denial to the Commissioner.  A final decision by the Commissioner exhausts the Department of Correction's (DOC) Administrative Remedy Procedure (ARP).  After exhausting the DOC's ARP, an inmate may submit a complaint to the Inmate Grievance Office (IGO).  See CS § 10-207(b).  The IGO is a unit within the Department of Public Safety and Correctional Services (DPSCS).  The IGO Executive Director may either dismiss the complaint or refer it to a hearing before an Administrative Law Judge (ALJ).  See CS § 10-208.  Once the complaint is dismissed or the ALJ issues an order, the inmate can appeal the ALJ's decision through the state court system.  The State argues that the grievance process is not complete until the inmate has completed this entire process and proceeded through the state court system.

[24]　　See Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 677 (4th Cir. 2005).

[25]　　Id. at 681.

15

the basic method of execution since 1994, when the State first enacted its lethal injection statutes. In Nelson v. Campbell, the Supreme Court instructs the lower courts to consider "the extent to which the inmate has delayed unnecessarily in bringing the claim" when deciding whether to grant preliminary injunctive relief.[26] Evans's counsel counters that they did not file earlier because of concerns that the case was not ripe (they did not know whether they had the final protocol) and because Evans's administrative complaint had not been exhausted. The Court accepts the representations of counsel. Accordingly, the Court decided not to count delay against Evans when applying the Blackwelder test.

      E.   The Supreme Court's Grant of Certiorari in Hill v. Crosby

On January 25, 2006, in Hill v. Crosby, 05-8794, the Supreme Court granted certiorari and a stay of execution to a Florida inmate (Clarence E. Hill) who had challenged Florida's lethal injection protocol under 42 U.S.C. § 1983.[27] Hill is set for argument on April 26, 2006. Since granting certiorari in Hill, the Supreme Court has stayed the execution of a second Florida inmate,[28] but the Court vacated the Seventh Circuit's stay of execution of an inmate in Indiana.[29]

---

[26]    541 U.S. 637, 649-50 (2004).

[27]    The Supreme Court granted certiorari on the following two questions:

    (1)    Whether the complaint brought under 42 U.S.C. § 1983 by a death-sentenced state prisoner, who seeks to stay his execution in order to pursue a challenge to the chemicals utilized for carrying out the execution, is properly recharacterized as a habeas corpus petition under 28 U.S.C. § 2254.

    (2)    Whether under [the Supreme] Court's decision in *Nelson*, a challenge to a particular protocol the State plans to use during the execution process constitutes a cognizable claim under 42 U.S.C. § 1983.

[28]    Rutherford v. Crosby, 05-8795.

16

Evans argues that the Supreme Court's grant of certiorari in <u>Hill</u> supports his request for a stay of execution because the Supreme Court will likely clarify legal issues relevant to his case. The State argues that <u>Hill</u> should have no impact on Evans's request for a stay because the Supreme Court is likely to consider only whether an inmate need allege alternative methods of execution when bringing a section 1983 challenge.

The Supreme Court's grant of certiorari in <u>Hill</u> does not warrant a stay. The Supreme Court appears to have taken up the case to clarify procedural issues, all of which this Court has decided in Evans's favor. Staying the execution until after the Supreme Court has issued an opinion is unlikely to benefit Evans.

### VIII. Conclusion

For the forgoing reasons, the Court will, by separate order, DENY the motion for a temporary restraining order and DENY the motion for a preliminary injunction.

It is so ORDERED this 1st day of February, 2006.

_____/s/_____
Benson Everett Legg
Chief Judge

---

[29] <u>Donahue v. Bieghler</u>, 05-684.